No. 25-1087

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

IN RE:

CENTER FOR BIOLOGICAL DIVERSITY, PEOPLE FOR PROTECTING
PEACE RIVER, BAYOU CITY WATERKEEPER, HEALTHY GULF,
MANASOTA-88, PORTNEUF RESOURCE COUNCIL, RISE ST. JAMES
LOUISIANA, SIERRA CLUB, WATERKEEPER ALLIANCE, and
WATERKEEPERS FLORIDA,

Petitioners.

**PETITION FOR WRIT OF MANDAMUS**

RACHAEL CURRAN
D.C. Cir. Bar # 65500
JACLYN LOPEZ
DC Cir. Bar # 62797
Jacobs Public Interest Law Clinic for
Democracy and the Environment,
Stetson University College of Law
1401 61st Street S.
Gulfport, FL 33707
(727) 490-9190
jmlopez@law.stetson.edu
(727) 537-0802
rcurran1@law.stetson.edu

RAGAN WHITLOCK
D.C. Cir. Bar # 65341
Center for Biological Diversity
P.O. Box 2155,
St. Petersburg, FL 33731
(727) 426-3653
rwhitlock@biologicaldiversity.org

*Attorneys for Petitioners*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

GLOSSARY OF ABBREVIATIONS .................................................. vii

INTRODUCTION ...............................................................................1

STATEMENT OF JURISDICTION...................................................2

STANDING .........................................................................................3

RELIEF SOUGHT ..............................................................................4

ISSUE PRESENTED ..........................................................................5

FACTS NECESSARY TO UNDERSTAND THE ISSUE PRESENTED ..............5

REASONS WHY THE COURT SHOULD ISSUE THE WRIT .............................9

  I.   Petitioners have a clear and indisputable right to mandamus relief compelling EPA to take action on their 2021 Petition. .................................11

  II.   EPA is violating a clear duty to respond to the 2021 Petition.......................12

  IV.  Existing enforcement authorities do not excuse the delay. ...........................13

  V.   EPA's delay is unreasonable and warrants mandamus relief pursuant to the *TRAC* factors........................................................................15

     A.  EPA's delay is not guided by a rule of reason.......................................16

     B.  EPA's delay is unreasonable when evaluated under the statutory scheme of RCRA........................................................................18

     C.  EPA's delay unreasonably prejudices interests in human health, welfare and the environment. .......................................................20

     D.  Neither competing priorities nor the absence of bad faith justify EPA's delay. ..............................................................................29

CONCLUSION....................................................................................30

ADDENDUM OF CERTIFICATES PURSUANT TO CIRCUIT RULE 21(d) ...A1

I.    Parties, Intervenors, and Amici to this Case..................................................A1

II.   Rulings Under Review.............................................................................A1

III.  Related Cases........................................................................................A1

IV.   Rule 26.1 Disclosure Statement.............................................................A2

CERTIFICATE OF COMPLIANCE......................................................A4

CERTIFICATE OF SERVICE .............................................................A4

# TABLE OF AUTHORITIES

## Cases

*AHA v. Burwell*,
  812 F.3d 183 (D.C. Cir. 2016) ............................................................10

*Ctr. for Law & Educ. v. Dep't of Educ.*,
  396 F.3d 1152 (D.C. Cir. 2005) ............................................................4

*Cutler v. Hayes*,
  818 F.2d 879 (D.C. Cir. 1987) ............................................................19

*Env't Def. Fund v. EPA*,
  852 F.2d 1309 (D.C. Cir. 1988) ............................................................6

*Env't Def. Fund v. EPA*,
  852 F.2d 1316 (D.C. Cir. 1988) ............................................................6

*Env't Def. Fund, Inc. v. Hardin*,
  428 F.2d 1093 (D.C. Cir. 1970) .................................................... 4, 13

*In re Am. Rivers & Idaho Rivers United*,
  372 F.3d 413 (D.C. Cir. 2004) ............................................ 10, 11, 17

*In re Bluewater Network*,
  234 F.3d 1305 (D.C. Cir. 2000) ........................................... 10, 25

*In re Core Commc'ns, Inc.*,
  531 F.3d 849 (D.C. Cir. 2008) ............................................................16

*In re Ctr. for Biological Diversity & Ctr. for Food Safety*,
  53 F.4th 665 (D.C. Cir. 2022) ............................................................12

*In re Nat'l Nurses United*,
  47 F.4th 746 (D.C. Cir. 2022) ...................................................... 2, 11

*In re United Mine Workers of Am. Int'l Union*,
  190 F.3d 545 (D.C. Cir. 1999) ............................................................30

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................3

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
  336 F.3d 1094 (D.C. Cir. 2003) ...................................................... 16, 29

*Muwekma Tribe v. Babbitt*,
  133 F. Supp. 2d 30 (D.D.C. 2000) ............................................................12

*Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*,
   740 F.2d 21 (D.C. Cir. 1984) ........................................................ 19, 29

*Sierra Club v. FERC*,
   827 F.3d 59 (D.C. Cir. 2016) .............................................................4

*Sychev v. Jaddou*,
   No. 20-3484 (CKK), 2022 WL 951378 (D.D.C. Mar. 30, 2022) ................ 20, 29

*Telecomms. Research & Action Ctr. v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) ................................... 2, 3, 9, 10, 13, 16, 18, 20, 29

## Statutes

5 U.S.C. § 553(b) ............................................................................ 2, 11

5 U.S.C. § 555(b) ..............................................................................11

5 U.S.C. § 555(e) ..............................................................................11

28 U.S.C. § 1651(a) ............................................................................2

42 U.S.C. § 6901(b)(4) ......................................................................19

42 U.S.C. § 6902(a)(3) ......................................................................19

42 U.S.C. § 6902(b) ...........................................................................19

42 U.S.C. § 6903(5) ...........................................................................6

42 U.S.C. § 6921(a) ...........................................................................20

42 U.S.C. § 6921(b)(3)(A) .................................................................6

42 U.S.C. § 6921(C) ...........................................................................6

42 U.S.C. § 6944(a) ...........................................................................19

42 U.S.C. § 6974(a) ..................................................................... 2, 11, 19

42 U.S.C. § 6976(a)(1) .......................................................................2

42 U.S.C. § 6982(p) ...........................................................................6

## Federal Register

54 Fed. Reg. 51654 (Dec. 15, 1989) .................................................. 27, 28

56 Fed. Reg. 27300 (June 13, 1991) ......................................... 7, 10, 17, 18

85 Fed. Reg. 66550 (Oct. 20, 2020) ...................................................24

86 Fed. Reg. 35795 (Jul. 7, 2021) ......................................................24

v

89 Fed. Reg. 104353 (Dec. 23, 2024) .......................................................................24

**State Regulations**

Fla. Stat. § 403.7222 ................................................................................................25

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| EPA | U.S. Environmental Protection Agency |
| FDEP | Florida Department of Environmental Protection |
| FOIA | Freedom of Information Act |
| LDEQ | Louisiana Department of Environmental Quality |
| NESHAP | National Emission Standard for Hazardous Air Pollutants |
| RCRA | Resource Conservation and Recovery Act |
| TSCA | Toxic Substances Control Act |

## INTRODUCTION

Center for Biological Diversity, People for Protecting Peace River, Bayou City Waterkeeper, Healthy Gulf, ManaSota-88, Portneuf Resource Council, Rise St. James Louisiana, Sierra Club, Waterkeeper Alliance, and Waterkeepers Florida (Petitioners) seek to compel the U.S. Environmental Protection Agency (EPA) to comply with duties that Congress set forth in the Resource Conservation and Recovery Act (RCRA) to protect the public from hazardous waste. For more than three decades, EPA has failed to follow through on its manifested intent to specifically regulate harmful fertilizer production wastes known as phosphogypsum and process wastewater. In 2021, several public health, environmental justice, and conservation groups petitioned EPA to revisit its 1991 Bevill Determination exempting these wastes from hazardous waste regulation and to promulgate new regulations listing phosphogypsum and process wastewater as hazardous wastes under Subtitle C of RCRA (2021 Petition).[1]

During EPA's ongoing, four-year delay in answering the 2021 Petition, environmental disasters of national importance and rapid industry expansion

---

[1] The balance of the rulemaking requests in the 2021 Petition fall under Section 21 of the Toxic Substances Control Act (TSCA) and Section 553 of the Administrative Procedure Act (APA). 2021 Petition, Appendix of Attachments ("APPX ATT") APPX ATT_V1_77. EPA denied the portions of the petition it deemed required a 90-day response under TSCA Section 21 on May 6, 2021. TSCA Petition Denial, APPX ATT_V1_1606. The non-RCRA related APA requests remain pending and are not the subject of this petition for writ.

explicitly warned of in the 2021 Petition have ensued. EPA's disregard of its clear

duty under RCRA Section 7004 and Administrative Procedure Act (APA) Section

553 to answer the 2021 Petition "within a reasonable time" harms Petitioners and

warrants this Court to order EPA to answer. 42 U.S.C. § 6974(a); 5 U.S.C. §

553(b).

## STATEMENT OF JURISDICTION

The All Writs Act authorizes this Court to issue a writ of mandamus to

compel agency action in aid of exercising its future jurisdiction over the final

agency action. 28 U.S.C. § 1651(a). "Because the statutory obligation of a Court of

Appeals to review on the merits may be defeated by an agency that fails to resolve

disputes, a Circuit Court may resolve claims of unreasonable delay in order to

protect its future jurisdiction." *Telecomms. Research & Action Ctr. v. FCC*, 750

F.2d 70, 76 (D.C. Cir. 1984) (*TRAC*). Because this Court has ultimate, exclusive

jurisdiction to review EPA's final agency action on the 2021 Petition under RCRA

Section 7006(a)(1),[2] EPA's failure to take action, or respond, makes this Court's

immediate intervention necessary and appropriate. 28 U.S.C. § 1651(a); 42 U.S.C.

§ 6976(a)(1); *see In re Nat'l Nurses United*, 47 F.4th 746, 752 (D.C. Cir. 2022)

---

[2] To the extent this Court determines notice from Petitioners to EPA pursuant to
RCRA's citizen suit provision, 42 U.S.C. § 6972(c), is required to exercise its
authority to issue a writ of mandamus to EPA, Petitioners sent EPA notice on April
15, 2024, and EPA confirmed receipt on April 22, 2024. Notice of Intent to Sue,
APPX ATT_V1_133.

("When an agency unlawfully withholds or unreasonably delays an action this court would have jurisdiction to review, the All Writs Act empowers us to issue a writ compelling the agency to complete the action so we can exercise our jurisdiction to review it.") (citing *TRAC*, 750 F.2d at 75–76).

## STANDING

Petitioners have standing as they are membership organizations that seek to protect the environment, including communities and wildlife, from harmful pollution. Notice of Intent to Sue, APPX ATT_V1_136–137. Petitioners' members live and recreate near phosphogypsum stacks and surface water and groundwater harmed by phosphogypsum and process wastewater. Declarations of Shannon Ansley, Kira Barrera, Martha Collins, Sharon Lavigne, Daniel Estrin, William Matturro, Andre Mele, Dustin Pack, Kristen Schlemmer, and Gale Tedhams, APPX ATT_V1_1–74. These members have standing to sue in their own right but rely on Petitioners to represent and protect their interests in clean water and air, wildlife, and safe communities. These interests are imminently threatened and harmed by EPA's delay in responding to the 2021 Petition. *See* Ansley, Barrera, Collins, Lavigne, Estrin, Matturro, Mele, Pack, Schlemmer, and Tedhams Declarations; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

These concrete, particularized injuries to Petitioners' members caused by EPA's unreasonable delay are germane to Petitioners' missions, and neither the

claim asserted nor the relief requested require any individual member to participate as a party to this lawsuit. *See Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016).

EPA's ongoing failure to comply with RCRA and take final agency action on the 2021 Petition within a reasonable time as required by Congress leaves Petitioners without any other remedy but to seek a writ of mandamus. *See Env't Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970) ("[A]n agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief."); *see also Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) ("Where plaintiffs allege injury resulting from violation of a *procedural* right afforded to them by statute and designed to protect their threatened concrete interest, the courts relax—while not wholly eliminating—the issues of imminence and redressability, but not the issues of injury in fact or causation.").

## RELIEF SOUGHT

Petitioners seek issuance of a writ compelling EPA to take action on the 2021 Petition and publish notice of such action in the Federal Register as expeditiously as possible and in no event later than six months from granting this Petition.

4

## ISSUE PRESENTED

Whether EPA's failure to respond to the 2021 Petition for more than four years is an unreasonable delay given the purposes of RCRA and ongoing environmental harm caused by inadequately regulated phosphogypsum and process wastewater.

## FACTS NECESSARY TO UNDERSTAND THE ISSUE PRESENTED

Phosphogypsum is the radioactive, carcinogenic, toxic waste generated by the fertilizer industry when it makes phosphoric acid. *See* EPA, Potential Uses of Phosphogypsum and Associated Risks, APPX ATT_V1_169–70, APPX ATT_V1_174–176, APPX ATT_V1_26; EPA, Report to Congress on Special Wastes from Mineral Processing (Report to Congress), APPX ATT_V2_617–622. This process also generates radioactive process wastewater, which contains numerous toxic constituents and is corrosive due to its acidity. Report to Congress, APPX ATT_V2_617–618. Despite these dangers, EPA has exempted phosphogypsum and process wastewater from hazardous waste regulations under what is known as the Bevill Amendment to RCRA, so they are discarded together in "stacks" that are often over one square mile wide and hundreds of feet tall. EPA, *TENORM: Fertilizer and Fertilizer Production Wastes,* APPX ATT_V3_911–915. These failing structures have a long history of environmental justice concerns and ecological disasters. Notice of Intent to Sue, APPX ATT_V1_148–149.

EPA recognizes that at representative U.S. facilities, phosphogypsum and process wastewater frequently meet the criteria for hazardous waste. EPA, Supplemental Information on Phosphoric Acid Production (Dec. 1990), at APPX ATT_V3_925. RCRA's Subtitle C defines hazardous waste as any discarded material:

> [W]hich because of its quantity, concentration characteristics, or physical, chemical or infectious characteristics may—(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. § 6903(5). However, in 1980, Congress amended RCRA with the Bevill Amendment, which temporarily exempted "special wastes," including phosphogypsum, process wastewater, and other mining and mineral processing wastes, from comprehensive Subtitle C hazardous waste regulation pending an EPA study and determination on whether regulation was warranted. 42 U.S.C. § 6921(b)(3)(A), (C); *id.* § 6982(p).

In 1990, after a decade of litigation that required EPA to narrow the scope of its interpretation of the amendment, EPA published its Report to Congress on phosphogypsum and process wastewater. *See Env't Def. Fund v. EPA*, 852 F.2d 1309 (D.C. Cir. 1988) (upholding EPA's determination as to extraction and beneficiation wastes); *Env't Def. Fund v. EPA*, 852 F.2d 1316 (D.C. Cir. 1988)

(requiring EPA to develop high-volume, low-hazard criteria for the remaining special wastes, including phosphogypsum and process wastewater, to determine which should be included within the exemption and subject to further study before a regulatory determination); Report to Congress, APPX ATT_V2_270. The Report to Congress identified widespread groundwater contamination near phosphogypsum stacks, contaminated off-site wells and drinking water sources, a lengthy history of harmful, unlawful releases and environmental damage cases, and an increased risk of cancer for those living near stacks. Report to Congress, APPX ATT_V2_622–628.

Despite the risks EPA outlined in its Report to Congress, in 1991, EPA published its Bevill Determination extending the temporary statutory Bevill exemption. Final Regulatory Determination for Special Wastes from Mineral Processing (Mining Waste Exclusion), 56 Fed. Reg. 27300 (June 13, 1991) (1991 Bevill Determination), APPX ATT_V3_1128. EPA stated that regulation under Subtitle C of RCRA would be "inappropriate" for all twenty "special wastes," including phosphogypsum and process wastewater, citing costs to the industry if required to adhere to Subtitle C regulation; however, EPA also specifically identified phosphogypsum and process wastewater as having remaining risks that EPA intended to address. *Id.*, APPX ATT_V3_1145. Therefore, instead of implementing hazardous waste regulation under Subtitle C of RCRA, EPA

7

announced its intent to develop and promulgate a regulatory program under the
Toxic Substances Control Act (TSCA) to govern phosphoric acid production
processes and reduce phosphogypsum and process wastewater toxicity and volume
at the point of generation. *Id.* EPA also explained its plan to utilize existing
emergency authorities under RCRA Section 7003 and Comprehensive
Environmental Response, Compensation, and Liability Act Section 106 to address
emergency situations and site-specific groundwater contamination issues it knew
would arise out of phosphogypsum stacks while it developed the regulatory
program. *Id.*

 EPA's intent to improve phosphogypsum and process wastewater regulation
never came to fruition. In 1992, EPA chartered the Phosphoric Acid Waste
Dialogue Committee under the Federal Advisory Committee Act to determine how
TSCA could regulate phosphoric acid waste. EPA, *Risks Posed by Bevill Wastes*
(1997), APPX ATT_V3_1166. According to a 1997 EPA report issued as part of
EPA's 1998 Phase IV Land Disposal Restriction rulemaking, the committee could
not identify any "feasible in-plant process changes that would significantly reduce
the volume and/or toxicity of phosphogypsum or phosphoric acid process
wastewater." *Id.* at 1167. Having determined that TSCA regulation is unsuitable,
EPA decided it would revisit its Bevill Determination to determine whether RCRA
Subtitle C regulation "remains inappropriate" to manage these wastes. *Id.*

In preparation for revisiting Subtitle C regulation, EPA evaluated the environmental risks posed by phosphogypsum and process wastewater at thirteen Florida sites "by applying the RCRA National Corrective Action Prioritization System to each site." *Id.* Despite results showing "high priority" under the national guidelines and groundwater contamination at each of these sites, *id.*, EPA never revisited its Bevill Determination, nor did it initiate any other rulemaking under TSCA for phosphogypsum and process wastewater regulation. *See* TSCA Petition Denial, APPX ATT_V1_131. Meanwhile, decades of phosphate fertilizer production have generated the industry billions of dollars in profits under this current regulatory regime, which has burdened communities with more than a billion tons of phosphogypsum waste and billions of gallons of process wastewater. Mosaic Company 2022 SEC Form 8-K, APPX ATT_V3_1178; Mosaic Company 2023 SEC Form 8-K, APPX ATT_V3_1211; Nutrien 2022 Annual Report, APPX ATT_V3_1244; Nutrien 2023 Annual Report, APPX ATT_V3_1388; Forbes Profile: Simplot Family, APPX ATT_V4_1540–1541.

## REASONS WHY THE COURT SHOULD ISSUE THE WRIT

The Court should grant this Petition because EPA's delay is "so egregious as to warrant mandamus." *TRAC*, 750 F.2d at 79. It has been over three decades since the EPA recognized that "more stringent regulation [of phosphogypsum and process wastewater] is both necessary and desirable," to address remaining risks,

9

1991 Bevill Determination, APPX ATT_V3_1144, and more than four years since Petitioners[3] submitted their 2021 Petition for rulemaking to EPA to formally request the agency to fulfill this duty.

To establish that mandamus relief is warranted, petitioners must demonstrate (1) a clear and indisputable right to the particular relief sought against the federal official, (2) that the federal official is violating a clear duty to act, and (3) that the plaintiff has no adequate alternate remedy. *AHA v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). Additionally, "[i]n the case of agency inaction, [the appellate court] not only must satisfy [itself] that there indeed exists such a duty, but that the agency has 'unreasonably delayed' the contemplated action." *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000).

EPA's "transparent violations of a clear duty to act" require this Court's intervention to correct. *See id.* at 1315; *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004) (unreasonable delay "signals the 'breakdown of regulatory processes'" (citation omitted)). Moreover, indefinite delay thwarts this Court's future jurisdiction by shielding EPA's decision-making from review of its final agency action. *TRAC*, 750 F.2d at 79 ("It is obvious that the benefits of

---

[3] Petitioners Portneuf Resource Council and Waterkeepers Florida joined this Petition for Writ of Mandamus but were not petitioners in the 2021 Petition. Petitioner Waterkeepers Florida is a coalition of member organizations. Many of these member organizations were original 2021 petitioners for rulemaking.

agency expertise and creation of a record will not be realized if the agency never takes action.").

## I.    Petitioners have a clear and indisputable right to mandamus relief compelling EPA to take action on their 2021 Petition.

EPA has a clear duty to act on administrative petitions "within a reasonable time" as set out by Congress in RCRA and the APA. 42 U.S.C. § 6974(a); 5 U.S.C. § 555(b). This duty to respond to the 2021 Petition is "incontrovertible and not a matter within the agency's discretion." *In re Nat'l Nurses United*, 47 F.4th at 752. To determine that an agency has a clear duty, courts look to "statutory requirements imposed by Congress and whether an Executive Branch agency retains discretion over a particular action." *Id.* While agencies have discretion regarding whether to deny or grant rulemaking petitions, they do not have the discretion to ignore them altogether. *In re Am. Rivers & Idaho Rivers United*, 372 F.3d at 419. ("We are not concerned here with what answer [the agency] might ultimately give the petitioners; rather, we are reviewing its failure to give them *any* answer. . . ."). RCRA and the APA direct EPA to take action on petitions for rulemaking in a reasonable amount of time, and the APA states that agencies shall give prompt notice of denial along with the grounds for denial. 42 U.S.C. § 6974(a); 5 U.S.C. §§ 553(b) and 555(e).

11

## II.     EPA is violating a clear duty to respond to the 2021 Petition.

EPA has failed to take action on the 2021 Petition for over four years.[4] Importantly, there is no end in sight for EPA's delay in. This "[C]ourt's inquiry into reasonableness of delay does not end with ascertaining the amount of time elapsed," but continues to inquire into whether the agency has given any indication of how long the action will take once begun. *Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 37 (D.D.C. 2000). EPA has not given any indication to Petitioners of an anticipated time frame that it expects to publish a response to the 2021 Petition. This "ambiguous, indefinite time frame" amounts to unreasonable delay. *Id.*

## III.     Petitioners have no adequate alternative remedy.

Because Petitioners cannot seek judicial review of agency action that is not final, Petitioners have no other adequate means, judicial or administrative, to obtain any relief other than mandamus. *See In re Ctr. for Biological Diversity & Ctr. for Food Safety*, 53 F.4th 665, 670 (D.C. Cir. 2022). Petitioners have exhausted all other available remedies and are accruing injuries awaiting EPA action. EPA's failure to take action on the 2021 Petition prevents Petitioners from presenting this Court with a final agency action to review, yet EPA's inaction is

---

[4] Petition for Rulemaking Under TSCA; Reasons for Agency Response; Denial of Requested Rulemaking, 86 Fed. Reg. 27546, 27547 (May 21, 2021) ("This Federal Register document does not address the petitioners' requests under Section 7004(a) of RCRA."), APPX ATT_V4_1607.

causing the same injuries to Petitioners' members' interests as would EPA's outright denial of the relief requested in the 2021 Petition. *See Env't Def. Fund v. Hardin*, 428 F.2d at 1099 ("[W]hen administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief."). Indefinite delay thwarts this Court's future jurisdiction by shielding EPA's decision-making from any review until it finally does comply with RCRA. *See TRAC*, 750 F.2d at 79.

## IV.    Existing enforcement authorities do not excuse the delay.

EPA's non-discretionary duty to respond to the 2021 Petition is not relieved by the agency's enforcement actions at facilities with alleged violations of RCRA associated with the management of hazardous and Bevill-Exempt Wastes.

In 2003, EPA compliance evaluation inspections triggered the first in a series of enforcement actions against the fertilizer industry for the illegal mixing of Bevill-exempt phosphogypsum and process wastewater with hazardous wastes from downstream diammonium phosphate and monoammonium phosphate (DAP/MAP) operations. Complaint, *United States v. Mosaic Fertilizer*, No. 8:15-cv-02286-JDW-TBM (M.D. Fla. Sept. 30, 2015), APPX ATT_V4_1611. As a result of these violations, EPA provides limited oversight at some, but not all, phosphogypsum facilities. *See* Consent Decree, *United States v. Mosaic Fertilizer*,

13

No. 8:15-cv-02286-JDW-TBM (M.D. Fla. Sept. 30, 2015) (Mosaic Florida

Consent Decree), APPX ATT_V4_1709–1793; Consent Decree, *United States v.*

*Mosaic Fertilizer*, No. 2:15-cv-04889 (E.D. La. Sept. 30, 2015), APPX

ATT_V4_1794–1878.

     Not every active phosphogypsum stack is under a federal consent decree.

For example, Mosaic's 2015 consent decree considers its Green Bay facility as a

"closing facility" with terms that effect closure, Mosaic Florida Consent Decree,

APPX ATT_V4_1717, but Mosaic reactivated Green Bay in 2021. Mosaic Green

Bay Notice of Reactivation, APPX ATT_V4_1879. Mosaic's reactivated Green

Bay facility is not covered by a RCRA consent decree that contemplates it as an

active, growing phosphogypsum stack receiving new waste, but rather, a "closing"

phosphogypsum stack. Mosaic Florida Consent Decree, APPX ATT_V4_1717.

     Even the hazardous and Bevill waste mixing consent decrees that do govern

operations at phosphogypsum stacks have done little to remedy structural integrity

issues and prevent further disaster. For example, Mosaic's New Wales facility in

Mulberry, Florida has experienced seismic activity, multiple sinkhole-like

anomalies, and a major sinkhole since Mosaic negotiated a consent decree that

covered this facility in 2015. O'Donnell 2016, APPX ATT_V4_1880–1882; Lopez

2022, APPX ATT_V4_1980. The 2016 sinkhole caused 215 million gallons of

acidic process wastewater and an unknown quantity of radioactive phosphogypsum

to collapse into the Floridan aquifer, a drinking source for millions of people. *Id.* To this day, Mosaic continues to pump 3,500 gallons *per minute* from recovery wells in an attempt to recover the contaminated groundwater from the plume in the Floridan aquifer, a drinking water source for millions of people. Mosaic New Wales Phase IV Gypsum Stack Extension Application (Feb. 15, 2024), APPX ATT_V4_1944.

While the consent decrees call for some phosphogypsum stack construction improvements and fertilizer plant retrofitting, they do not subject phosphogypsum or process wastewater to Subtitle C regulation. Therefore, EPA's piecemeal enforcement activities do not excuse the delay in responding to the 2021 Petition.

## V. EPA's delay is unreasonable and warrants mandamus relief pursuant to the *TRAC* factors.

This Court evaluates claims of unreasonable delay guided by the six factors established in *TRAC*:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

750 F.2d at 80.

The *TRAC* factors weigh in favor of mandamus here. More than three decades ago, EPA manifested its intent to address risks posed by phosphogypsum and process wastewater via an alternative regulatory regime or by revisiting its Bevill Determination. Petitioners' 2021 Petition reminding EPA of its promises and calling on the agency to take action has gone unanswered for more than four years. This ongoing delay undermines the purpose of RCRA, endangers human health and the environment, and prejudices communities near phosphogypsum stacks.

### A.    *EPA's delay is not guided by a rule of reason.*

EPA's more than four-year delay in taking action to regulate phosphogypsum and process wastewater is not guided by a rule of reason. A "rule of reason" must guide the time courts afford agencies to make decisions and depends upon the "complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *TRAC*, 750 F.2d at 80; *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003). This first factor is "most important" in determining the reasonableness with which an agency has acted or failed to act. *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008).

Beginning in 1990, EPA acknowledged the considerable health and
environmental risks associated with phosphogypsum and process wastewater.
*Report to Congress*, APPX ATT_V2_614–671. EPA then acknowledged that it
needed to protect human health and the environment from phosphogypsum and
process wastewater by developing a program under TSCA and reevaluating
regulation under RCRA Subtitle C. 1991 Bevill Determination, APPX
ATT_V3_1145; *Risks Posed by Bevill Wastes*, APPX ATT_V3_1167. But EPA
never did either. In the more than thirty years since EPA first acknowledged such
measures were necessary, phosphogypsum stacks have continued to grow, emit
radon, and cause environmental disasters. *See*, *e.g.,* Lopez 2022, APPX
ATT_V4_1961–1988. EPA's lengthy delay is not guided by the rule of reason. The
delay ignores these disasters, and the conditions that created them, and instead
facilitates industry expansion and the accompanying increase in disaster frequency
and magnitude.

A reasonable time frame for agencies to act "is typically counted in weeks or
months, not years." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d at 419.
EPA's delay in responding to the 2021 Petition is not guided by the rule of reason
given the public health and environmental consequences and the more than thirty
years that have elapsed since the agency recognized the need to further regulate

these wastes. *See* 1991 Bevill Determination, 56 Fed. Reg. at 27316, APPX ATT_V3_1145; *Risks Posed by Bevill Wastes*, APPX ATT_V3_1167.

Furthermore, EPA's predominant rationale for exempting phosphogypsum and process wastewater from hazardous waste regulation in 1991—the fertilizer industry's inability to absorb the costs of Subtitle C compliance—is no longer valid. The Mosaic Company, one of the three major domestic phosphate fertilizer producers, is a Fortune 500 company with a reported net income of $3.6 billion dollars in 2022 and $1.2 billion dollars in 2023. Mosaic Company, 2022 SEC Forms 8-K, APPX ATT_V3_1244–1387; Mosaic Company 2023 SEC Form 8-K, APPX ATT_V3_12111243. Nutrien Ltd., another major phosphate producer and Fortune 500 company, had a net income of $7.7 billion in 2022 and $1.3 billion in 2023. Nutrien 2022 Annual Report, APPX ATT_V3_1244–1387; Nutrien 2023 Annual Report, APPX ATT_V3_1388–1539. The privately held J.R. Simplot Company is not required to disclose its net income, but Forbes Magazine reported that J.R. Simplot Company had $9.8 billion in estimated revenue in 2023. Forbes Profile: Simplot Family, APPX ATT_V4_1540–1541.

**B.     EPA's delay is unreasonable when evaluated under the statutory scheme of RCRA.**

The second *TRAC* factor asks the Court to consider the delay in the context of the statute that authorizes the agency's action. *TRAC*, 750 F.2d at 80 (citing *Pub. Citizen Health Research Grp. v. Comm'r, Food & Drug Admin.*, 740 F.2d 21, 34–

35 (D.C. Cir. 1984). In encouraging the public to petition EPA for protective rulemaking against harmful waste under RCRA, Congress instructed EPA to respond to such petitions in "a reasonable time." 42 U.S.C. § 6974(a). While neither RCRA nor the APA provide a fixed deadline or define "a reasonable time" for answering petitions for rulemaking, courts must "estimate the extent to which delay may be undermining the statutory scheme." *Cutler v. Hayes*, 818 F.2d 879, 897–98 (D.C. Cir. 1987).

EPA's delay in responding to the 2021 Petition undermines the statutory purpose of RCRA to protect human health and the environment from improperly managed waste. 42 U.S.C. § 6901(b)(4) (finding open dumping is "particularly harmful to health, contaminates drinking water from underground and surface supplies, and pollutes the air and the land"). To effectuate this statutory purpose, Congress sought to reduce the total amount of waste generated, and in the case of hazardous waste, to reduce or eliminate its generation "as expeditiously as possible." *Id.* § 6902(b). To that end, RCRA prohibits "open dumping on the land" and requires "the conversion of existing open dumps to facilities which do not pose a danger to the environment or to health." *Id.* § 6902(a)(3).

In establishing swift implementation deadlines and timetables for compliance, Congress left no doubt when it enacted RCRA that it intended EPA to act quickly. *See id.* § 6944(a) (directing EPA to publish solid waste guidelines

19

within one year from enactment); *id.* § 6921(a) (directing EPA to promulgate regulations identifying the characteristics of hazardous waste and listing particular hazardous wastes within eighteen months of enactment). The current management of phosphogypsum and process wastewater consists of widespread open dumping that presents a reasonable probability of causing adverse effects on human health or the environment. 2021 Petition, APPX ATT_V1_119. And this open dumping of corrosive, carcinogenic, radioactive, toxic waste is generated at annual volumes that exceed the total for all regulated hazardous wastes combined. EPA 2023 National RCRA Biennial Hazardous Waste Report, APPX ATT_V4_1989–1992.

### C. *EPA's delay unreasonably prejudices interests in human health, welfare and the environment.*

EPA's delay is unreasonable considering the significant risks to human health and the environment presented by phosphogypsum and process wastewater's toxic constituents. The third *TRAC* factor instructs courts to evaluate the harm to human health and welfare and is frequently analyzed together with the fifth factor, which looks to the nature of the interests prejudiced by the agency's delay. *TRAC*, 750 F. 2d at 80; *Sychev v. Jaddou*, No. 20-3484 (CKK), 2022 WL 951378, at *16 (D.D.C. Mar. 30, 2022). "Delays that might be reasonable in the sphere of economic regulations are less tolerable when human health and welfare are at stake." *TRAC*, 750 F. 2d at 80. EPA identified these risks in its 1990 Report to Congress, and the risks have only grown more severe as the fertilizer industry has expanded.

20

For example, less than two months after EPA received the 2021 Petition, the Piney Point phosphogypsum stack in Florida discharged 215 million gallons of toxic, acidic, nutrient-laden process wastewater from the phosphogypsum stack into Tampa Bay. Finding "[a]ction is necessary to prevent loss of life, personal injury, or severe property damage," Emergency Final Order, *In Re: HRK Holdings, L.L.C.'s a.k.a Eastport Terminal*, OGC File No. 21-0323 (Mar. 29, 2021), APPX ATT_V4_1993–2002. Florida regulators ordered the discharge after the phosphogypsum stack nearly catastrophically collapsed when a series of liner tears and pressurized process wastewater breached a retaining wall that threatened the phosphogypsum stack's structural stability. Barnes et al. 2021, APPX ATT_V5_2003–2016. The threat of collapse was so significant that emergency officials evacuated more than 300 homes and closed a highway near the facility, and Florida Governor Ron DeSantis declared a state of emergency due to the "immediate and substantial danger to human health, safety, welfare and the environment." Fla. Exec. Order No. 21-82 (Apr. 3, 2021), APPX ATT_V5_2017–2025.

The discharge dumped 200 tons of nitrogen into Tampa Bay, exceeding the typical *annual* nitrogen load estimates for the entire estuary in a matter of days. Beck et al. 2022, APPX ATT_V5_2026–2040. EPA did not consider the impact of a large-scale nitrogen release at the time of its 1991 regulatory determination,

21

despite knowing, based on industry responses to EPA surveys solicited in preparation of the Bevill study, that high levels of nitrogen and ammonia from non-Bevill exempt downstream fertilizer operations are discarded in phosphogypsum stacks. Conservation Organizations' Piney Point UIC Comment Letter (Oct. 6, 2021), APPX ATT_V5_2041–2058.

The high levels of nutrients from the Piney Point phosphogypsum stack failure fueled one of the worst red tide events Tampa Bay has experienced in fifty years. Beck et al. 2022, APPX ATT_V5_2026–2040. After the discharge, an initial analysis of the area revealed the occurrence of a localized diatom bloom. *Id.* When *K. brevis*, a harmful algal species, grows to abnormal levels, it forms a "red tide" that lowers dissolved oxygen levels in the water and produces toxins that can kill fish, birds and other marine species and make people sick. Morrison et al. 2023, APPX ATT_V5_2059–2075. Piney Point's discharge of nitrogen and phosphorus stimulated and sustained a deadly red tide outbreak that killed 600 tons of marine life in Tampa Bay. Johnson 2021, APPX ATT_V5_2076–2078.

Also during EPA's delay, Mosaic temporarily halted stack expansion construction activities due to seismic activity at the New Wales phosphogypsum stack in Mulberry, Florida. FDEP Wastewater Compliance Inspection Report – Mosaic New Wales (Oct. 21, 2023), APPX ATT_V5_2079–2083. The New Wales facility has experienced at least five known sinkholes, releasing process

wastewater to the environment and groundwater. The largest of these sinkholes occurred in 2016, releasing 215 million gallons of process wastewater and an undisclosed amount of phosphogypsum solids to the Floridan aquifer. *See* 2021 Petition, APPX ATT_V1_112; Notice of Intent to Sue, APPX ATT_V1_142. In June 2023, that same facility experienced a liner tear, and in October 2023, another liner tear resulted in an unknown quantity of process wastewater loss from the phosphogypsum stack. Letter from Ardaman & Assoc. to FDEP re: Confirmed Critical Condition at Area of Interest 4 (Dec. 14, 2023), APPX ATT_V5_2084–2087. FDEP records do not indicate where the lost process wastewater from this latest "water loss event" went. FDEP Wastewater Compliance Inspection Report, APPX ATT_V5_2079–2083.

Despite these frequent failures, FDEP is currently considering yet another expansion request at the New Wales facility as of February 2024. Mosaic New Wales Phase IV Extension Application, APPX ATT_V4_1883–1960.

Industry expansion is not confined to Florida. The Louisiana Department of Environmental Quality (LDEQ) recently approved an expansion request and issued a draft permit for Mosaic's Uncle Sam facility near a predominantly Black community fighting for environmental justice in St. James Parish. LDEQ Public Notice: Uncle Sam Plant, Public Hearing and Request for Public Comment (Feb. 15, 2024), APPX ATT_V5_2088–2089. In 1990, EPA determined that Louisiana

stacks are unstable if more than 40 feet tall because of weak soils. Report to Congress, APPX ATT_V2_629. But the Uncle Sam stack, operating under state regulation and a federal consent decree, but not federal hazardous waste regulations, is now nearly 200 feet tall. LDEQ Public Notice: Uncle Sam, APPX ATT_V5_2088.

Since submission of the 2021 Petition, the fertilizer industry has sought other dangerous ways to dispose of its waste. EPA has recently approved an application from Mosaic to use phosphogypsum in a test road, following the EPA's approval and then reversal of that approval of the Fertilizer Institute's application for widespread use of phosphogypsum in roads. Notice of Approval for Other Use of Phosphogypsum, 89 Fed. Reg. 104353, 104535–104536 (Dec. 23, 2024), APPX ATT_V5_2090–2091; Approval of the Request for Other Use of Phosphogypsum by the Fertilizer Institute, 85 Fed. Reg. 66550, 66551–52 (Oct. 20, 2020), APPX ATT_V5_2092–2094; Withdrawal of Approval for Use of Phosphogypsum in Road Construction, 86 Fed. Reg. 35795 (Jul. 7, 2021), APPX ATT_V5_2095. Mosaic is also applying for Underground Injection Control (UIC) permits to dispose of process wastewater underground at four of its phosphogypsum stack facilities. Mosaic Riverview UIC Application (Oct 17, 2023), APPX ATT_V5_2096–2152; Mosaic New Wales UIC Application (Feb. 16, 2024), APPX ATT_V5_2153–2203; Mosaic Bartow UIC application (Mar. 15, 2024),

APPX ATT_V5_2204–2253; FDEP Notice of Draft Permit for Mosaic Plant City (Nov. 22, 2024), APPX ATT_V5_2254–2283. The UIC plans include areas of vulnerable karst geology with a history of sinkholes causing large-scale waste releases to ground waters. *See* Mosaic New Wales UIC Application, APPX ATT_V5_2153–2203. Such UIC well siting would be prohibited by Florida law, if not for EPA's 1991 Bevill Determination exempting phosphogypsum and process wastewater from the federal definition of hazardous waste.[5]

The continued delay in taking action on the 2021 Petition also "implicate[s] important environmental concerns." *In re Bluewater Network*, 234 F.3d at 1316. The Gulf region, where the majority of phosphogypsum stacks are located, is experiencing the fastest rates of sea level rise in the nation. Huang 2023, APPX ATT_V5_2284–2286. Coastal flooding is growing more damaging as hurricane-generated storm surges grow more severe because of climate change. Berardelli 2019, APPX ATT_V5_2287–2294. Storm surge is projected to increase by 25 to 47 percent along the U.S. Gulf and Florida coasts because of the combined effects of sea level rise and growing hurricane intensity. Balaguru et al. 2016, APPX ATT_V5_2295–2305.

---

[5] Fla. Stat. § 403.7222 (banning since 1992 any new hazardous waste landfills, including hazardous waste UICs). The Florida Legislature enacted the ban specifically because of Florida's fragile karst geology. *Id.*

These climate-change driven events have created major problems for phosphogypsum stack management, *see* 2021 Petition, APPX ATT_V1_115–116. and will continue to impact the ability of phosphogypsum stacks to withstand these weather events. For example, Hurricane Frances caused 65 million gallons of process wastewater to discharge from the Mosaic Riverview facility to Tampa Bay. Complaint for Natural Resource Damages, *United States of America et al. v. Mosaic Fertilizer, LLC*, No. 13-cv-00386-RAL-TGW (M.D. Fla. Feb. 11, 2013). That same facility suffered damage from Hurricane Milton, releasing at least 39,600 gallons. Mosaic 5-Day Follow-Up Report to FDEP (Oct. 15, 2024), APPX ATT_V5_2306–2308.

Even between major breaches and catastrophes, the many toxic constituents found in phosphogypsum and process wastewater that find their way into the environment present inherent risks to human health. Among these toxic constituents, long-term chronic exposure to arsenic has been linked to lung cancer, and ingestion of water contaminated with arsenic may result in manifestations of toxicity all over the body. Hughes et al. 1988*,* APPX ATT_V5_2309–2315. Chronic lead exposure is toxic in every human organ system that has been studied, and "no safe blood lead level in children has been identified." U.S. HHS, Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Lead* (2020) at 3, APPX ATT_V6_2332. People exposed to elevated air concentrations of

selenium have reported dizziness, fatigue, and irritation of mucous membranes. U.S. HHS, Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Selenium* (2003) at 5, APPX ATT_V6_2923. Chronic exposure to low levels of cadmium in the air can lead to kidney disease and damage to lungs and the nasal cavity. U.S. HHS, Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Cadmium* (2012) at 4, APPX ATT_V6_3379. Chromium compounds are carcinogenic to humans. U.S. HHS, Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Chromium* (2012) at 4, APPX ATT_V6_3865.

Active phosphogypsum stacks, as currently managed, are uncovered open dumps. EPA has concluded that phosphogypsum stacks pose a considerable air-pathway cancer risk due to their radioactive radon gas emissions. *Report to Congress*, APPX ATT_V2_628. Radon exposure is the second leading cause of lung cancer among non-smokers. EPA, *Health Risks of Radon*, APPX ATT_V7_4435. Additionally, fugitive dust emissions that occur when construction vehicles drive over the stacks provide an inhalation pathway for the toxic constituents within phosphogypsum particles. National Emission Standards for Hazardous Air Pollutants; Radionuclides, 54 Fed. Reg. 51654, 51675 (Dec. 15, 1989), APPX ATT_V7_4467. These toxic constituents include arsenic, chromium, and radionuclides. *Id.* Based on these risks, EPA found a total air pathway lifetime

maximally exposed individual fatal cancer risk of approximately 9 in 100,000 individuals. *Id.*

EPA's delay continues to prejudice fence-line communities[6] that suffer increased health risks by virtue of their location near phosphogypsum stacks. Fleischman & Franklin 2017, APPX ATT_V7_4508–4543. African Americans are 75 percent more likely to live in these fence-line communities than the average American. *Id.*

Progress Village near Mosaic's Riverview facility is a fence-line community, designed in the 1950s to provide home ownership to Tampa's segregated Black residents displaced by the construction of an interstate. 2021 Petition, APPX ATT_V1_123. Despite significant opposition from the historically Black community, county officials approved the construction of a new phosphogypsum stack adjacent to the community in 1984. *Id.* Today, the community near the stack is in the 95th percentile in the state for exposure to toxic releases to the air, and 90th percentile in the state for exposure to particulate matter pollution. EPA EJScreen Community Report – Progress Village, APPX ATT_V7_4544–4547.

---

[6] "Fence-line communities" are communities that are located next to an industrial facility and are directly affected by the operation of the facility. Fleischman & Franklin 2017, APPX ATT_V7_4508–4543.

#### D.     Neither competing priorities nor the absence of bad faith justify EPA's delay.

EPA's over four-year delay in responding cannot be justified by competing priorities, and the Court "need not find any impropriety" to hold that the agency action is unreasonably delayed. *See TRAC*, 750 F. 2d at 80 (citing *Pub. Citizen Health Research Grp.*, 740 F.2d at 34) (internal quotations omitted). The Court's concern for competing priorities stems from not wanting to prejudice others similarly situated by requiring the agency to put Petitioners at "the head of the queue" to the effect of moving "all others back one space." *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1100.

However, the "universe of [those] similarly situated" is small here. *Sychev*, 2022 WL 951378, at *6 (internal quotations omitted). EPA singled out phosphoric acid wastes among the twenty special wastes exempted from Subtitle C regulation in 1991 as having remaining risks that required regulation. 1991 Bevill Determination, 56 Fed. Reg. 27300, APPX ATT_V3_1128–1159. Furthermore, the 2021 Petition is currently among nine pending RCRA petitions before EPA. EPA, *Petitions to the Office of Land and Emergency Management* (Jan. 16, 2025), APPX ATT_V7_4548–4557. Of these pending petitions, seven are from industry groups seeking deregulation, and two of those post-date the 2021 Petition. *Id*. Only one pending petition besides the 2021 Petition seeks an increase in regulation (concerning the disposal of coal combustion residuals in municipal solid waste

29

landfills.) *Id.* And even given other priorities, "there is a limit to how long [the agency] may use these justifications to excuse inaction." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 554 (D.C. Cir. 1999).

## CONCLUSION

For the foregoing reasons, the Petitioners respectfully request the Court issue a Writ compelling EPA to respond to the 2021 Petition within six months. EPA is under a mandatory duty to answer all such petitions for rulemaking in a reasonable amount of time and cannot abrogate this duty any longer. While EPA has delayed answering, avoidable catastrophes continue to occur at phosphogypsum stacks. Because of this harm and EPA's egregious conduct, Petitioners are entitled to mandamus relief.

Respectfully submitted on March 10, 2025.

/s/ *Rachael Curran*
RACHAEL CURRAN (D.C. Bar # 65500)
JACLYN LOPEZ (D.C. BAR # 62797)
Jacobs Public Interest Law Clinic for
Democracy and the Environment,
Stetson University College of Law
1401 61st Street S.
Gulfport, FL 33707
(727) 537-0802
rcurran1@law.stetson.edu
(727) 490-9190
jmlopez@law.stetson.edu


/s/ *Ragan Whitlock*
RAGAN WHITLOCK (D.C. Bar #65341)

30

Center for Biological Diversity
P.O. Box 2155,
St. Petersburg, FL 33731
(727) 426-3653
rwhitlock@biologicaldiversity.org

*Attorneys for Petitioners*

# ADDENDUM OF CERTIFICATES PURSUANT TO CIRCUIT RULE 21(d)

Pursuant to D.C. Circuit Rules 21(d) and 28(a)(1)(A), on behalf of Petitioners, undersigned counsel certifies as follows:

## I.      Parties, Intervenors, and Amici to this Case

This action is a petition for writ of mandamus and is neither an appeal from the ruling of a district court nor a direct review of final agency action. The parties to this case include:

Petitioners – Center for Biological Diversity, People for Protecting Peace River, Bayou City Waterkeeper, Healthy Gulf, Manasota-88, Portneuf Resource Council, Rise St. James Louisiana, Sierra Club, Waterkeeper Alliance, and Waterkeepers Florida.

Respondent, if ordered pursuant to D.C. Circuit Rule 21(a) – Environmental Protection Agency.

## II.     Rulings Under Review

This original action is a petition for writ of mandamus and is neither an appeal from the ruling of a district court nor a direct review of final agency action. Petitioners are challenging an agency's unreasonable delay.

## III.    Related Cases

Petitioners are not aware of any related cases.

A1

IV.    **Rule 26.1 Disclosure Statement**

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, the Center for

Biological Diversity, People for Protecting Peace River, Bayou City Waterkeeper,

Healthy Gulf, Manasota-88, Portneuf Resource Council, Rise St. James Louisiana,

Sierra Club, and Waterkeeper Alliance state that they are environmental non-profit

organizations that have no parent companies. No publicly held company has a ten

percent or greater ownership interest in any of the above-listed organizations.

Waterkeepers Florida is a regional entity composed of all 15 Waterkeeper

organizations working in the State of Florida. Each member organization is a

registered 501(c)(3) non-profit that has no parent companies. No publicly held

company has a ten percent or greater ownership interest in any of the Waterkeepers

Florida membership organizations.

Respectfully submitted on March 10, 2025,

/s/ *Rachael Curran*
RACHAEL CURRAN (D.C. Bar # 65500)
JACLYN LOPEZ (D.C. BAR # 62797)
Jacobs Public Interest Law Clinic for
Democracy and the Environment,
Stetson University College of Law
1401 61st Street S.
Gulfport, FL 33707
(727) 537-0802
rcurran1@law.stetson.edu
(727) 490-9190
jmlopez@law.stetson.edu

_/s/ Ragan Whitlock_
RAGAN WHITLOCK (D.C. Bar # 65341)
Center for Biological Diversity
P.O. Box 2155,
St. Petersburg, FL 33731
(727) 426-3653
rwhitlock@biologicaldiversity.org

_Attorneys for Petitioners_

## CERTIFICATE OF COMPLIANCE

In compliance with D.C. Circuit Rule 18(b), I certify that the forgoing petition was submitted in a proportionally spaced font of 14 points and that, according to the word-count program in Microsoft Word, it contains 6615 words in compliance with D.C. Circuit Rule 18(b).

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of March, 2025, I served the foregoing Petition for Writ of Mandamus and associated Appendix of Attachments in Support of Petition for Writ of Mandamus via certified U.S. mail on Respondent (if ordered pursuant to D.C. Circuit Rule 21(a)), Environmental Protection Agency.


DATED: March 10, 2024

*/s/ Ragan Whitlock*
Ragan Whitlock

A4